PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 12-2561/2562/2563/2564/2565
_____

GLENDA JOHNSON;
STEVEN LUCIER,
Appellants in 12-2561

v.

SMITHKLINE BEECHAM CORPORATION, doing
business as GLAXOSMITHKLINE; GLAXOSMITHKLINE,
LLC; GLAXOSMITHKLINE HOLDINGS LLC; SANOFI-
AVENTIS, U.S., L.L.C.; AVANTOR PERFORMANCE
MATERIALS; GRUNENTHAL U.S.A.; GRUNENTHAL
GMBH

SmithKline Beecham Corporation;
GlaxoSmithKline, LLC; and
GlaxoSmithKline Holdings, LLC
Appellants in 12-2562

Avantor PerformanceMaterials,
Appellant in 12-2563

Sanofi-Aventis U.S.,LLC,
Appellant in 12-2564

Grunenthal U.S.A.,
            Appellant in 12-2565
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-11-cv-05782)
District Judge:  Hon. Paul S. Diamond
_____

Argued
March 5, 2013

Before:   AMBRO, JORDAN, and VANASKIE, *Circuit Judges*.

(Filed: June 7, 2013)
_____

Steve W. Berman
Craig R. Spiegel   [ARGUED]
Nick Styant-Browne
Hagens Berman Sobol Shapiro
1918 Eighth Avenue - #3300
Seattle, WA   98101

Mary A. Geppert
Jeffrey L. Kodroff
John A. Macoretta
Spector, Roseman, Kodroff & Willis
1818 Market Street - #2500
Philadelphia, PA   19103

Kay G. Reeves
6815 Lakeshore Drive
Dallas, TX   75214
        *Counsel for Appellants/Cross-Appellees*

Lisa S. Blatt   [ARGUED]
Sarah M. Harris
R. Stanton Jones
Arnold & Porter
555 Twelfth Street, NW
Washington, DC   20004

Michael T. Scott
Melissa A. Wojtylak
Reed Smith
1650 Market Street - #2500
Philadelphia, PA   19103
        *Counsel for Appellees/Cross-Appellants, SmithKline*
        *Beecham Corp.,  GlaxoSmithKline, and*
        *GlaxoSmithKline Holdings LLC*

Anand Agneshwar
Bruce R. Kelly
Arnold & Porter
399 Park Avenue
New York, NY  10022

Kenneth A. Murphy
Drinker, Biddle & Reath
18th & Cherry Streets
One Logan Square - #2000
Philadelphia, PA   19103

Daniel S. Pariser
Arnold & Porter
555 Twelfth Street, NW
Washington, DC   20004
    *Counsel for Appellees, Sanofi-Aventis US Inc.,
    and Avantor Performance Materials*

Albert G. Bixler
Rachel C. Rosser
Eckert, Seamans, Cherin & Mellott
50 S. 16th Street – 22nd Fl.
Philadelphia, PA   19102

Sara J. Gourley
Eugene A. Schoon
Sidley Austin
One South Dearborn St.
Chicago, IL   60603
    *Counsel for Appellees/Cross-Appellants
    Grunenthal USA and Grunenthal GmbH*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Plaintiffs Glenda Johnson and Steven Lucier appeal an order of the United States District Court for the Eastern District of Pennsylvania denying their motion to remand this action to Pennsylvania state court. They contend that the District Court lacks subject matter jurisdiction over their claims because the parties do not have complete diversity of

citizenship. We conclude that the District Court's assessment of citizenship was correct, and that none of the Defendants is a citizen of the same state as either Plaintiff. Accordingly, we will affirm.

## I.    **Background**[1]

Johnson, a Louisiana citizen, and Lucier, a Pennsylvania citizen (collectively, "Plaintiffs"), suffer from birth defects allegedly caused by their mothers' use of the drug thalidomide during pregnancy in the 1960s.[2]

---

[1] The parties agreed to proceed on the jurisdictional record made in *Brewer v. SmithKline Beecham Corp.*, 774 F. Supp. 2d 720 (E.D. Pa. 2011), a similar case against many of the same defendants, supplemented by additional documents and affidavits.

[2] Thalidomide was developed in the 1950s, and from 1957 to 1961 it was prescribed to treat a variety of conditions, including morning sickness during pregnancy. Emma Wilkinson, *Thalidomide Survivors To Get £20M*, BBC News, Dec. 23, 2009, *available at* http://news.bbc.co.uk/2/hi/8428838.stm (last visited on Feb. 11, 2013). It was taken off the market after being linked to widespread, serious birth defects, including malformed organs and shortened or nonexistent limbs. *Id.* In Europe, more than 10,000 children were born with birth defects linked to thalidomide before the drug was banned. Carl Zimmer, *Answers Begin to Emerge on How Thalidomide Caused Defects*, New York Times, Mar. 15, 2010, *available at* http://www.nytimes.com/2010/03/16/science/16limb.html?ref =science&pagewanted=all&_r=0 (last visited on Feb. 11, 2013). The drug was not FDA-approved during that period,

Defendants, described in more depth below, are drug companies (and their successors-in-interest) that developed, designed, manufactured, and distributed thalidomide. According to Plaintiffs, "newly-accessible evidence reveals" that Defendants were aware of the drug's risks even while marketing it to pregnant women, and that for the last 60 years they have been engaged in an elaborate cover-up to avoid liability for those actions. (Appellants' Opening Br. at 8.)

Seeking redress for lifelong physical and emotional suffering, Plaintiffs filed this personal injury action against Defendants in the Philadelphia Court of Common Pleas on August 26, 2011. Within thirty days, on September 14, 2011, Defendants removed the case to federal court, asserting diversity jurisdiction. Plaintiffs then filed a motion to remand the action to state court, arguing that diversity jurisdiction is lacking and removal was improper because four of the Defendants – GlaxoSmithKline Holdings ("GSK Holdings"), GlaxoSmithKline LLC ("GSK LLC"), SmithKline Beecham Corporation ("SmithKline Beecham"), and Avantor Performance Materials ("Avantor") – are Pennsylvania citizens, as is Plaintiff Steven Lucier.[3] The

---

and therefore its alleged effects were less widespread in the United States. *Id.*; *see also* Anita Bernstein, *Formed by Thalidomide: Mass Torts as a False Cure for Toxic Exposure*, 97 Colum. L. Rev. 2153, 2154 (1997).

[3] There are three other defendants – Grunenthal U.S.A., Grunenthal GmbH, and Sanofi-Aventis U.S., Inc. – whose citizenship is uncontested. Sanofi-Aventis and Grunenthal U.S.A. are citizens of both Delaware and New Jersey, and Grunenthal GmbH is a German citizen.

District Court disagreed and denied Plaintiffs' motion, but it certified that order for interlocutory review.[4] *Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 498 (E.D. Pa. 2012). Plaintiffs then requested permission to appeal, which we granted on May 22, 2012. On appeal, Plaintiffs repeat their argument that the District Court lacks subject matter jurisdiction because GSK LLC, GSK Holdings, SmithKline Beecham, and Avantor are all citizens of Pennsylvania.

GSK LLC is a large pharmaceutical company that is responsible for operating the U.S. division of GlaxoSmithKline plc, the British entity that is the "global head" of the GlaxoSmithKline group of companies. (Appellees' Br. at 6.) It was formed on October 27, 2009, when its predecessor – SmithKline Beecham – was converted from a Pennsylvania corporation into a Delaware limited liability company ("LLC"). More specifically, SmithKline Beecham underwent a two-step conversion, first becoming a Delaware corporation by filing a "certificate of conversion" with the Delaware Secretary of State, in accordance with Delaware Code Title 8, Section 265, and then converting into a Delaware LLC under Sections 18-201 and 18-214 of the Delaware Limited Liability Company Act, Del. Code Ann. tit. 6, ch. 18. The LLC was formed under Delaware law because it "permits a corporation to convert to an LLC without any break in the continuity of the legal entity." (*Id.* at 10.)

---

[4] As discussed in more depth below, we have jurisdiction to review an interlocutory order when a district court certifies in writing that its order involves "a controlling question of law as to which there is substantial ground for difference of opinion." 28 U.S.C. § 1292(b).

7

The purpose of that conversion was to obtain the tax benefits of LLC status and thus facilitate the formation of a joint entity with Pfizer, Inc. called "ViiV Healthcare," which was created to "develop critical treatments for HIV/AIDS at not-for-profit pricing." (Appellees' Br. at 9.) According to Defendants, "[i]f [SmithKline Beecham] had remained a corporation, it would have incurred hundreds of millions of dollars in unnecessary tax liability for transferring its existing HIV/AIDS assets to the new entity – a 'prohibitive' obstacle that would have prevented the venture from being financially viable." (*Id.*) Following the conversion, SmithKline Beecham dissolved under Pennsylvania law, which allows dissolution "[w]henever a domestic business corporation has domesticated itself under the laws of another jurisdiction." 15 Pa. Cons. Stat. Ann. § 1980.

Despite that change in entity form and domicile, SmithKline Beecham was, at least operationally, largely unaffected by its conversion to GSK LLC. The company's headquarters is still in Philadelphia, Pennsylvania, where it occupies 650,000 square feet of office space and employs 1,800 people. Its management is substantively intact. SmithKline Beecham's board of directors became GSK LLC's "board of managers," and those managers operate from the same offices they did before, with three located in Philadelphia and a fourth in North Carolina. The ownership structure of the business is also unchanged. SmithKline Beecham's sole shareholder had been Defendant GSK Holdings, a Delaware corporation founded in 1999 that holds GlaxoSmithKline plc's investments in the United States. Following the conversion, GSK Holdings became GSK LLC's sole member. Although the default rule under

8

Delaware law provides that "the management of a limited liability company shall be vested in its members," Del. Code Ann. tit. 6, § 18-402, GSK LLC assigned that task to the board of managers, making it a "manager-managed," rather than a "member-managed," LLC.[5] Therefore, both before and after the conversion, GSK Holdings acted solely as the owner, not as the operator, of the company.

Because it is a holding company, rather than an operating company, GSK Holdings' own activities are quite limited, consisting mostly of approving the financial statements from its investments.[6] It also decides whether to pay dividends, make new investments, and approve proposed restructurings. GSK Holdings' three-member board of directors has the exclusive authority to control all of those activities, which it does through resolutions it adopts at quarterly and special board meetings. For most of the time relevant to this lawsuit, that board consisted of Michael

---

[5] That structure was established in accordance with Delaware law by GSK LLC's limited liability company agreement. *See* Del. Code Ann. tit. 6, § 18-402 (permitting an LLC agreement to vest management authority in a manager). That agreement provided that "[t]he members of the Board of Directors of SmithKline Beecham Corporation shall continue as the initial manager of the company, following the conversion, without the need for further action." (App. at 681.)

[6] At all times relevant to this lawsuit, those investments primarily included money market investments, intra-group accounts, and the ownership interest in GSK LLC.

9

Corrigan, a senior officer of GSK LLC based in Philadelphia, Julian Heslop, the chief financial officer of GlaxoSmithKline plc based in London, and Donald McLamb, a Wilmington-based employee of Wilmington Trust Services ("Wilmington Trust"), a company that provides "corporate services to Delaware holding companies" (App. at 756).[7] In his capacity as an employee of Wilmington Trust, McLamb also serves as a director or officer of 50 to 75 other companies.

Since 2001, GSK Holdings' board meetings have been held in Wilmington, Delaware at the Wilmington Trust headquarters.[8] They typically last 15 to 30 minutes, and,

---

[7] Those three directors were in office when discovery was conducted in *Brewer*. *See* 774 F. Supp. 2d at 726. Julian Heslop retired on March 31, 2011, and therefore was not a member of the board of directors at the time this case was removed. Plaintiffs argue that we must therefore disregard his role in the corporation, but they have presented no evidence that GSK Holdings' corporate structure has changed in the wake of Heslop's retirement. Moreover, they agreed to proceed on the record developed in *Brewer*, *see supra* note 1, and they themselves rely extensively on Heslop's deposition testimony. Therefore, we assume that although Heslop himself may no longer be carrying out the functions of GSK Holdings' London-based director, his testimony is still indicative of the corporation's structure and activities.

[8] From 1999 until 2001, the company's board meetings took place in Philadelphia, and that city was therefore listed in GSK Holdings' bylaws as the location of its headquarters and board meetings. Although that location changed in 2001, the company failed to update those bylaws until recently, when this litigation brought the mistake to their attention.

although McLamb always attends them in person, directors Corrigan and Heslop often participate telephonically from other offices. The parties disagree about the extent of the actual decision-making that occurs at the meetings. Plaintiffs argue that GSK Holdings conducted its substantive work in Philadelphia and London, and that the board meetings served merely to "ratify decisions made somewhere other than Delaware." (Appellants' Opening Br. at 32.) Defendants, on the other hand, insist that GSK Holdings' directors "reached decisions about GSK Holdings'[] investments only at board meetings and based on their own independent judgment" (Appellees' Br. at 21), and that the board had exclusive "direction, control, and coordination" of GSK Holdings' activities (*id.* at 40).

Apart from those meetings, GSK Holdings' presence in Wilmington is minimal. It subleases a small, ten-by-ten foot office from Wilmington Trust, but that office is rarely visited, and it serves primarily to house GSK Holdings' books and records. GSK Holdings' other Wilmington activities consist mostly of administrative and secretarial functions, such as paying monthly bills for the office. Those functions are usually conducted by Elizabeth Bothner, GSK Holdings' sole employee, who devotes about 20 hours per year to the company. GSK Holdings has one Delaware bank account that, as of November 2010, had less than $25 in it.

Although GSK Holdings' board has the sole authority to manage the company's activities, it receives various support services from individuals in both Philadelphia and London. Officers Jan Lyons and Sarah-Jane Chilver-Stainer,[9]

---

[9] GSK Holdings has six corporate officers. In addition

who are based in Philadelphia and London, respectively, provide tax assistance and facilitate GSK Holdings' investment transactions, as does Philadelphia-based GSK LLC employee Audrey Klijian. Complex tax issues are sometimes addressed by Helen Jones, a London-based GSK employee. George Brown, another GSK employee based in London, maintains GSK Holdings' financial records, and overall strategic guidance comes from the London office. The GSK Holdings board has also authorized a number of people in both Philadelphia and London to sign documents on GSK Holdings' behalf and enter into certain routine transactions for the company. Finally, directors Corrigan and Heslop generally prepare for board meetings at their respective offices, and staff at the Philadelphia office compile and circulate the materials that the board reviews during those meetings.

Beyond those limited functions, GSK Holdings has no operations. It produces no products, conducts no research, and has no sales. Rather, as is typical for a holding company, its role is confined to owning its interest in its subsidiary – GSK LLC. *See* Black's Law Dictionary 298 (8th ed. 2004) (defining a holding company as a "company formed to control other companies, [usually] confining its role to owning stock and supervising management"); 19 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations, glossary at 13 (perm. ed., rev. vol. 2006) (defining a holding company as "a corporation whose principal business is the holding of stocks of other

to Lyons and Chilver-Stainer, Holdings' three directors serve as officers, as does Elizabeth Bothner, the company's Wilmington-based part-time employee.

12

corporations"). That subsidiary, on the other hand, has widespread and complex operations, as it develops, produces, and sells pharmaceutical products nationwide. Such a corporate structure, in which an operating company is wholly owned by a holding company, has many features that are appealing to large business enterprises. For example, the holding company structure gives each subsidiary the autonomy to manage its business without regard to other business units, it allows the enterprise to prevent liabilities incurred by one investment from jeopardizing other investments, and it facilitates borrowing transactions and restructurings. *See* Robert Charles Clark, *The Regulation of Financial Holding Companies*, 92 Harv. L. Rev. 789, 816-825 (1979) (describing the benefits of holding company formation). Director Heslop testified that, for those reasons, including a holding company within an enterprise's corporate structure "is a very, very common thing." (App. at 705.)

The last defendant – Avantor Performance Materials – is a New Jersey corporation that is not part of the GlaxoSmithKline group of companies. Until 2011, it had its principal place of business in New Jersey. In February 2011, Avantor announced that it was relocating its headquarters to Center Valley, Pennsylvania. The corporation officially moved its rank-and-file employees to its new headquarters on September 19, 2011, five days after Defendants removed this action. The parties disagree on precisely when Avantor's high-level officers began directing activities from Pennsylvania. Plaintiffs note that Avantor's website, a corporate directory, and many technical documents and federal filings listed its address in Center Valley starting before this action was removed. They also observe that Avantor's CEO gave an interview from the new headquarters

13

two days before the official move date. Defendants argue that those actions were all part of the preparation for the move, which multiple affidavits, an internal company memo, and a news story demonstrate occurred on September 19.

The District Court reviewed all of the foregoing evidence and concluded none of the Defendants was a Pennsylvania citizen at the time of removal. It thus held that diversity jurisdiction is present. *Johnson*, 853 F. Supp. 2d at 489, 498. Specifically, the Court found that GSK Holdings has its principal place of business in Wilmington, Delaware, where its board of directors manages its investments. *Id.* at 495. It is therefore a Delaware citizen, as is GSK LLC, which, as a limited liability company, assumes the citizenship of its owner. *Id.* at 491. As for the remaining Defendants, the Court held that Avantor was still a New Jersey citizen when the case was removed, *id.* at 495, and that SmithKline Beecham's citizenship is irrelevant because, as a dissolved corporation whose assets and liabilities have been assumed by another entity, it is a nominal party with no interest in the litigation, *id.* at 496-97. Accordingly, the Court concluded it had jurisdiction over the case, and denied Plaintiffs' motion to remand. *Id.* at 498. This timely appeal followed.

## II.    Jurisdiction and Standard of Review

The District Court determined that it had jurisdiction pursuant to 28 U.S.C. § 1332. In denying remand, it certified for interlocutory review the jurisdictional question of whether two of the Defendants – GSK Holdings and GSK LLC (collectively, the "GSK Defendants") – are Pennsylvania citizens, in order to resolve the uncertainty created by "contrary determinations as to the GlaxoSmithKline

14

Defendants' citizenship" that have emerged recently. *Id.* at 490. To date, six judges from the Eastern District of Pennsylvania have ruled on the issue of the GSK Defendants' citizenship. Four of them concluded that GSK Holdings and GSK LLC are Pennsylvania citizens, and thus granted motions for remand due to lack of diversity. *See Brewer v. SmithKline Beecham Corp.*, 774 F. Supp. 2d 720 (E.D. Pa. 2011) (Savage, J.); *Yeatts v. SmithKline Beecham Corp.*, No. 11-6711, 2012 WL 5488907 (E.D. Pa. Mar. 29, 2012) (Slomsky, J.); *Murray v. SmithKline Beecham Corp.*, No. 11-3510, 2012 WL 5488905 (E.D. Pa. Mar. 29, 2012) (Jones, J.); *Monroe v. SmithKline Beecham Corp.*, No. 10-2140, 2010 WL 2606682 (E.D. Pa. June 25, 2010) (Joyner, J.). Two others, including the District Judge in this case, reached the opposite conclusion. *See Johnson*, 853 F. Supp. 2d at 489 (Diamond, J.); *White v. SmithKline Beecham Corp.*, No. 10-2141, 2010 WL 3119926 (E.D. Pa. Aug. 6, 2010) (McLaughlin, J.). Due to that disagreement, and to the likelihood that it will continue absent our decision, the District Court certified the issue of the GSK Defendants' citizenship as "a controlling question of law as to which there is substantial ground for difference of opinion." *Johnson*, 853 F. Supp. 2d at 490 (quoting 28 U.S.C. § 1292(b)) (internal quotation marks omitted).

We therefore have jurisdiction to review the Court's order pursuant to 28 U.S.C. § 1292(b),[10] which we accepted by granting Plaintiffs' request for permission to appeal. Although the District Court noted only the issue of the GSK

---

[10] Our references to the District Court are, unless otherwise noted, to the Court acting through the Honorable Paul S. Diamond in this case.

15

Defendants' citizenship as requiring interlocutory review, we have jurisdiction to "address any issue fairly included within the certified order." *Yamaha Motor Corp., U.S.A. v. Calhoun*, 516 U.S. 199, 205 (1996). The certified order from which this appeal originated denied all Plaintiffs' bases for remand, including the alleged Pennsylvania citizenship of SmithKline Beecham and Avantor. We therefore have jurisdiction to review the District Court's citizenship determination for each of the challenged Defendants, not just for GSK Holdings and GSK LLC. *See id.* (noting that "it is the *order* that is appealable, and not the controlling question identified by the district court" (internal quotation marks omitted) (emphasis in original)); *cf. Morris v. Hoffa*, 361 F.3d 177, 196 (3d Cir. 2004) ("Although the scope of review on an interlocutory appeal is generally constrained to the questions certified for review by the district court, *we may consider any grounds justifying reversal*." (internal quotation marks omitted) (emphasis in original)).

We exercise plenary review over issues of jurisdiction. *Grand Union Supermarkets of the V.I., Inc. v. H.E. Lockhart Mgmt., Inc.* 316 F.3d 408, 410 (3d Cir. 2003). Under that standard, we review determinations of law *de novo*, but a court's factual findings regarding domicile or citizenship are reviewed for clear error. *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006). When reviewing for clear error, an appellate court "must accept the trial court's findings" unless it is "left with the definite and firm conviction that a mistake has been committed." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 (1982) (internal quotation marks omitted); *see also Frett-Smith v. Vanterpool*, 511 F.3d 396, 399 (3d Cir. 2008) (applying that standard to the factual findings which underpin a court's

determination of diversity jurisdiction). Put another way, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

Plaintiffs argue that it would be unfair to apply the clearly erroneous standard to the factual findings in this case because of the contrary outcomes reached by different district judges on this jurisdictional issue. But varying outcomes do not change that we are called upon to review only the particular order on appeal, nor do they put us in a better position to make our own factual findings. *See Inwood Labs.*, 456 U.S. at 855 (recognizing the "unique opportunity afforded the trial court judge to evaluate the credibility of witnesses and to weigh the evidence"). Rule 52(a) of the Federal Rules of Civil Procedure makes clear that "[f]indings of fact … must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). The Supreme Court has held that that standard applies "even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson*, 470 U.S. at 574. We are therefore not at liberty to substitute our own jurisdictional facts for those credited by the District Court, unless that Court's findings are clearly erroneous. We reiterate, however, that our overall review is plenary, and thus we do not defer to the District Court's application of the law to those facts.

17

## III.    Discussion

A civil action brought in state court may be removed by the defendant to federal district court if the federal court would have had original jurisdiction over the claim. 28 U.S.C. § 1441(a). "Diversity of citizenship subject matter jurisdiction falls within the original jurisdiction of the district court," pursuant to § 1332(a) of Title 28 of the United States Code, and thus "a state court case that implicates diversity jurisdiction" may generally be removed, *Brown v. Francis*, 75 F.3d 860, 865 (3d Cir. 1996), provided that the defendant is not a citizen of the state in which the action is brought, 28 U.S.C. § 1441(b)(2). *See also* 28 U.S.C. § 1332(a) (granting jurisdiction in cases between citizens of different states in which the amount in controversy exceeds $75,000). Jurisdiction under § 1332(a) requires "complete diversity," meaning that "no plaintiff can be a citizen of the same state as any of the defendants." *Grand Union Supermarkets*, 316 F.3d at 410. Diversity of citizenship must have existed at the time the complaint was filed, *id.*, and at the time of removal, *Abels v. State Farm Fire & Cas. Co.*, 770 F.2d 26, 29 (3d Cir. 1985), and the burden is on the removing party to establish federal jurisdiction, *id.* "Because lack of jurisdiction would make any decree in the case void and the continuation of the litigation in federal court futile, the removal statute should be strictly construed and all doubts resolved in favor of remand." *Brown*, 75 F.3d at 864-65 (quoting *Abels*, 770 F.2d at 29) (internal quotation marks omitted).

Plaintiffs argue that removal of their case was improper because the federal courts lack subject matter jurisdiction over it. They contend that each of the four Defendants involved in this appeal is a Pennsylvania citizen,

18

and thus that diversity jurisdiction is lacking because Plaintiff Steven Lucier is also a citizen of that state.[11]   Specifically, they maintain that GSK Holdings' principal place of business is in Philadelphia, and, because a limited liability company's citizenship is determined by the citizenship of its members, both GSK Holdings and GSK LLC are therefore Pennsylvania citizens.  Plaintiffs further argue that although SmithKline Beecham dissolved, Pennsylvania law preserves its citizenship for purposes of diversity jurisdiction.  As for Avantor, it became a Pennsylvania citizen when it moved its headquarters to Center Valley, Pennsylvania, which Plaintiffs claim may have happened before the case was removed.[12]  We address each of those arguments in turn and conclude, as the District Court did, that none of the Defendants was a Pennsylvania citizen at the time of removal.

---

[11] For the same reason, they also contend that removal of the case violated the rule barring removal when any "defendant is a citizen of the forum state." *Lincoln Property Co. v. Roche*, 546 U.S. 81, 84 (2005); *see* 28 U.S.C. § 1441(b)(2).  Plaintiffs do not dispute that the amount in controversy exceeds $75,000, as required by 28 U.S.C. § 1332(a).

[12] Plaintiffs do not specify when Avantor moved its headquarters to Pennsylvania.  Rather, they contend that "Avantor has not met its burden of proving that its principal place of business was in New Jersey, not Pennsylvania, when Defendants removed this action on September 14, 2011." (Appellants' Opening Br. at 47.)

A.    *Citizenship of the GSK Defendants*

Section 1332(a) grants federal courts jurisdiction over civil actions between "citizens of different [s]tates," 28 U.S.C. § 1332(a)(1), and it is well established that a corporation is considered a "citizen" for purposes of that provision, *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189 (1990). Since 1844, the Supreme Court has recognized that a corporation is "capable of being treated as a citizen … as much as a natural person." *Louisville, Cincinnati & Charleston R.R. Co. v. Letson*, 43 U.S. 497, 558 (1844). It has taken considerably longer, however, for Congress and the Court to decide how a corporation's citizenship should be determined. In 1958, after years of studying the matter, Congress amended § 1332 to provide that a corporation is a citizen of both its state of incorporation and the state "where it has its principal place of business." 28 U.S.C. § 1332(c)(1); *see also Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181, 1189-90 (2010) (describing the legislative history of that enactment). But applying the phrase "'principal place of business' … proved more difficult … than its originators likely expected," *Hertz*, 130 S. Ct. at 1190, and that difficulty resulted in "divergent and increasingly complex interpretations" by the courts of appeals, *id.* at 1192. In 2010, the Supreme Court stepped in to resolve the confusion, holding in *Hertz* that "the phrase 'principal place of business' refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities," which is often "metaphorically called its 'nerve center.'" *Id.* at 1186.

In endorsing the "nerve center" test, the Court "place[d] primary weight upon the need for judicial

20

administration of a jurisdictional statute to remain as simple as possible," *id.*, and it rejected other approaches involving complex multifactor tests designed to pinpoint a corporation's "center of gravity," *id.* at 1191. Instead, it adopted the comparatively simpler method of identifying the single place that is the corporation's "brain" – its "actual center of direction, control, and coordination" – which is usually its headquarters. *Id.* at 1192-93; *see also id.* at 1193 ("A corporation's 'nerve center,' usually its main headquarters, is a single place."). *Hertz* also warned courts to guard against jurisdictional manipulation by ensuring that a corporation's headquarters is actually its center of direction, "not simply an office where the corporation holds its board meetings," *id.* at 1192, or "a bare office with a computer," *id.* at 1195. If there is evidence of such manipulation, *Hertz* explained that courts should look past that manipulation, and "take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation." *Id.*

*Hertz* said nothing, however, about how to determine the citizenship of an unincorporated entity. Such entities do not have the same legal status as a corporation, and the Supreme Court has made clear that, "[w]hile the rule regarding the treatment of corporations as 'citizens' has become firmly established," that treatment cannot be extended to other entities. *Carden*, 494 U.S. at 189; *see also id.* ("That rule must not be extended." (internal quotation marks omitted)). In *Carden v. Arkoma*, the Court held that, because unincorporated entities are not considered "citizens" in their own right, "diversity jurisdiction in a suit by or against [an unincorporated] entity depends on the citizenship of … each of its members." *Id.* at 195-96 (citations and internal quotation marks omitted). In other words, because

21

such an entity is not recognized as a legal person, courts should look to the citizenship of the people or corporations who comprise it to determine if diversity jurisdiction exists. The principal place of business of an unincorporated entity is therefore irrelevant to determining its citizenship.

That rule holds true despite the substantive similarities between corporations and other entities. *Id.* at 196. The Court in *Carden* acknowledged that unincorporated entities can be "functionally similar" to corporations, and that "[c]onsiderations of basic fairness and substance over form" may "require that [they] receive similar treatment." *Id.* (first alteration in original) (internal quotation marks omitted). Yet it nonetheless enforced the rigid jurisdictional distinction between corporations and other entities. *See id.*; *see also Hoagland ex rel. Midwest Transit, Inc. v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737, 739-40 (7th Cir. 2004) (holding that a nonbusiness corporation, even though it may differ from business corporations in more respects than unincorporated entities do, is nonetheless treated as a citizen for diversity jurisdiction purposes). Such adherence to mechanical rules may seem at first glance to be unfair, but it comports with the Court's unwavering insistence that jurisdictional rules "remain as simple as possible." *Hertz*, 130 S. Ct. at 1186; *see also Carden*, 494 U.S. at 196 ("The resolutions we have reached above can validly be characterized as technical, precedent-bound, and unresponsive to policy considerations raised by the changing realities of business organization. But, … that has been the character of our jurisprudence in this field … ."). As the United States Court of Appeals for the Seventh Circuit has explained:

> Functional approaches to legal questions are often, perhaps generally, preferable to mechanical rules; but the preference is reversed when it comes to jurisdiction. When it is uncertain whether a case is within the jurisdiction of a particular court system, not only are the cost and complexity of litigation increased by the necessity of conducting an inquiry that will dispel the uncertainty but the parties will often find themselves having to start their litigation over from the beginning, perhaps after it has gone all the way through to judgment.

*Hoagland*, 385 F.3d at 739-40. For that reason, although the rise of new business structures may make the rigid divide between corporations and other entities appear outdated, the Supreme Court has explicitly left to Congress the task of "accommodating our diversity jurisdiction to the changing realities of commercial organization," if it sees fit to do so. *Carden*, 494 U.S. at 197.

In recognition of those principles, this and every other Circuit Court to face the question have held that the citizenship of a limited liability company "is determined by the citizenship of each of its members." *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 418 (3d Cir. 2010); *see also id.* at 420 (collecting cases from our sister circuits). In *Zambelli*, we noted that limited liability companies "resemble corporations in many respects," but we recognized that the Supreme Court has "flatly rejected arguments in favor of extending the rule of corporate citizenship to analogously formed business entities." *Id.* at 419 (citing *Carden*, 494 U.S.

23

at 189). Therefore, we opted to treat limited liability companies as we do partnerships and other "unincorporated associations," and held that courts must look to the citizenship of a limited liability company's members to determine if there is diversity jurisdiction. *Id.* at 420.

Both sides in the dispute before us now agree that, under *Zambelli*, GSK LLC's citizenship is defined by that of its sole member: GSK Holdings. As a corporation, GSK Holdings is a citizen of its state of incorporation and of the state where it has its principal place of business, 28 U.S.C. § 1332(c)(1), which *Hertz* defined as its "nerve center." 130 S. Ct. at 1186. It is undisputed that GSK Holdings is incorporated in Delaware, so it is clearly a Delaware citizen. Therefore, in order for GSK Holdings – and, by extension, GSK LLC – to also be Pennsylvania citizens, as Plaintiffs claim, GSK Holdings' "actual center of direction, control, and coordination," *i.e.*, its nerve center, *id.* at 1192, must be located in Pennsylvania.

Plaintiffs provide two explanations for why they believe GSK Holdings' nerve center is in Pennsylvania, both of which were endorsed in a trilogy of opinions from the Eastern District of Pennsylvania. *See Patton ex rel. Daniels-Patton v. SmithKline Beecham Corp.*, 2011 WL 6210724, at *5 (E.D. Pa. Dec. 14, 2011); *Maldonado ex rel. Maldonado v. SmithKline Beecham Corp.*, 841 F. Supp. 2d 890, 897 (E.D. Pa. 2011); *Brewer*, 774 F. Supp. 2d at 729-30, 732.[13] First,

---

[13] Those opinions were authored by the Honorable Timothy J. Savage. *Brewer*, as Judge Savage's first statement on the matter, provides the core of his analysis. *See* 774 F. Supp. 2d at 729-32. *Maldonado* supplemented and clarified

they argue that we should consider GSK LLC's activities in the determination of GSK Holdings' citizenship, because, as Plaintiffs put it, GSK Holdings had the authority to manage GSK LLC, but "delegated" that power to GSK LLC's managers. (Appellants' Opening Br. at 25.) Under that "delegation theory," GSK Holdings' nerve center is in Philadelphia, because that is where GSK LLC's managers are based. Second, they maintain that, even if we do not consider GSK LLC's management, "Holdings' own holding-company activities" are directed from Philadelphia, and thus that is its principal place of business. (*Id.* at 27.) We are unpersuaded by either of those arguments.

## 1. *The Delegation Theory*

Plaintiffs' novel delegation theory makes GSK LLC's management the focus in assessing GSK Holdings' nerve center. Noting that the default rule under Delaware law is that "the management of a limited liability company shall be vested in its members," Del. Code Ann. tit. 6, § 18-402, Plaintiffs conclude, as the court did in *Brewer*, that "[GSK] Holdings had the exclusive right and power to control, direct, run, manage, and operate [GSK] LLC." 774 F. Supp. 2d at 729. According to Plaintiffs, GSK Holdings opted not to retain that power, instead "delegat[ing] that duty to Philadelphia-based managers." (Appellants' Opening Br. at 26 (citing *Brewer*, 774 F. Supp. 2d at 729 (explaining that GSK Holdings had delegated "the operational decision-making authority and power of [GSK] LLC to [GSK] LLC's

aspects of the *Brewer* holding. *See* 841 F. Supp. 2d at 894-97. *Patton* repeats *Maldonado*'s analysis. 2011 WL 6210724, at *5.

25

officers and directors")).)  Looking at that delegation, the court in *Brewer* concluded that "[t]he 'managers' of [GSK] LLC are still part of [GSK] Holdings because they are *managing* [GSK] LLC *on behalf of* [GSK] Holdings." *Brewer*, 774 F. Supp. 2d at 729 (emphasis in original).  Based on that premise, Plaintiffs argue that GSK LLC's Philadelphia-based management decisions should be considered "'corporate activities' for which GSK Holdings was responsible."  (Appellants' Opening Br. at 26.)  Those corporate activities far outweigh GSK Holdings' other limited holding-company functions, and thus, say Plaintiffs, its principal place of business is in Philadelphia.  As *Brewer* put it, because "[GSK] Holdings has effectively transplanted the vast majority of its 'brain' or 'nerve center' to its managers in Philadelphia," it must be considered a Pennsylvania citizen. 774 F. Supp. 2d at 730.

At the outset, it is important to note that the record does not support that description of GSK Holdings' relationship to GSK LLC.  To say that GSK Holdings "transplanted … its 'brain' or 'nerve center'" to GSK LLC's managers implies that at some point GSK Holdings' activities included directing and controlling GSK LLC.  But GSK Holdings has never occupied such a role.  It has always functioned solely as the owner of GSK LLC, just as it did when it was the sole shareholder of GSK LLC's predecessor, SmithKline Beecham.  The only decision by GSK Holdings that arguably has affected GSK LLC's management was the decision to structure that company as a manager-managed LLC – in other words, GSK Holdings' decision *not* to manage GSK LLC.  It is hard to see how that decision, which resulted in GSK Holdings continuing to operate as it had before SmithKline Beecham's conversion to GSK LLC, could

involve the kind of transplant that Plaintiffs and *Brewer* describe.[14]

But even if we were to accept *Brewer*'s characterization, adopting the delegation theory would require that we turn our holding in *Zambelli* upside down. *Zambelli* and the Supreme Court opinions on which it is based, *e.g.*, *Carden*, 494 U.S. at 189; *United Steelworkers of Am. v. R.H. Bouligny, Inc.*, 382 U.S. 145, 146-47 (1965), instruct courts that the citizenship of an unincorporated association like a limited liability company is determined by looking to the citizenship of its members. 592 F.3d at 420. We are not supposed to focus on GSK LLC's activities; rather, precedent dictates that we turn our attention to the citizenship of GSK LLC's sole member, GSK Holdings. While they acknowledge that precedent, Plaintiffs ask us to define GSK Holdings' citizenship by contemplating its status as a member of GSK LLC. Put more simply, to determine the citizenship of a limited liability company using Plaintiffs' approach, we must look to its member, but then, if that member is a holding

---

[14] Notably, Plaintiffs identify no cases, other than *Brewer* and its progeny, that characterize the relationship between a manager-managed LLC and its sole member in such a manner. Moreover, *Brewer* has been rejected in at least two district court cases, and Plaintiffs identify no other districts that endorse its approach. *See Jennings v. HCR ManorCare Inc.*, -- F. Supp. 2d -- , No. 12-1397, 2012 WL 5360911, at *3 (D.S.C. Oct. 3, 2012) ("The Court declines to adopt the reasoning of *Brewer*."); *Dalton v. Georgia-Pacific L.L.C.*, No. 12-415, 2012 WL 2072766, at *5 (D.S.C. May 4, 2012) (same).

company, we must immediately look back to the limited liability company, reversing the *Zambelli* analysis entirely.[15]

GSK Holdings' allegedly "unique" relationship with GSK LLC does not justify applying that inverted approach. *See Brewer*, 774 F. Supp. 2d at 729 (describing "the unique circumstance where the holding company is the sole member of a manager-managed limited liability company"). According to *Brewer*, "[w]here the sole member of a limited liability company is a holding company … we are presented with an anomaly in applying the 'nerve center' test," and we should consider the LLC's activities despite *Zambelli*'s instruction to the contrary.[16]  774 F. Supp. 2d at 728-29.  But

---

[15] That analysis would also not be limited to the facts of this case, as *Brewer* appears to indicate.  774 F. Supp. 2d at 728-29; *see also Maldonado*, 841 F. Supp. 2d at 897 ("The *Brewer* holding is narrower than GSK makes it out to be.  It does not apply to all limited liability companies.  Nor does it apply to all manager-managed limited liability companies.").  According to *Brewer*, the delegation theory applies only in situations "[w]here the sole member of a limited liability company is a holding company that holds one constituent company and several intra-group accounts."  *Id.*  But whether an LLC's members are holding companies, operating companies, or individuals, they must establish the management structure for the LLC, either by "delegating" that management authority or assuming it (or some combination thereof).  *Brewer* bases its holding on just that – the member's decision to delegate management authority – and there is nothing in that reasoning that limits its application to holding companies.

[16] *Maldonado* stepped back from that characterization

28

the situation presented here is hardly anomalous. Holding companies are ubiquitous, especially in large business enterprises, and courts have been determining their nerve centers for decades.[17] *See, e.g.*, *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 63 (1st Cir. 1993) (determining the nerve center of two holding companies that were partners in a limited partnership). The fact that the holding company at issue here holds an LLC rather than a corporation does not, in itself, complicate the nerve center analysis.

The argument that we must look to GSK LLC's activities to identify GSK Holdings' nerve center also ignores the well-established rule that a parent corporation maintains separate citizenship from a subsidiary unless it has exerted

---

somewhat, explaining that "holding companies and single member limited liability companies are not unusual and are, indeed, common." 841 F. Supp. 2d at 894. It explained that the point of *Brewer* was that "where the sole member of a limited liability company is a holding company," the rules in *Zambelli* and *Hertz* "intersect," which raises the "novel" question of how the holding company's citizenship should be defined. *Id.* Therefore, while *Maldonado* may agree that GSK LLC's structure is common, it still bases its holding on the supposedly unique questions raised by that structure.

[17] Although *Hertz* is a recent decision, many circuits applied the "nerve center" test before its formal adoption by the Supreme Court. In fact, the First Circuit long ago identified the "nerve center" test as the "most appropriate in the case of a holding company," *Lugo-Vina v. Pueblo Int'l, Inc.*, 574 F.2d 41, 43 n.2 (1st Cir. 1978), because such companies do not have physical operations, *Diaz-Rodriguez v. Pep Boys Corp*, 410 F.3d 56, 60 (1st Cir. 2005).

such an overwhelming level of control over the subsidiary that the two companies do not retain separate corporate identities. *Quaker State Dyeing & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140, 1142 (3d Cir. 1972); *see also Taber Partners*, 987 F.2d at 62-63 (emphasizing that, "in determining a corporation's principal place of business, [the] inquiry must focus *solely* on the business activities of the corporation whose principal place of business is at issue"). Plaintiffs do not allege that GSK Holdings and GSK LLC disregarded corporate formalities, nor do they claim that GSK Holdings controls its subsidiary's operations. In fact, they argue the opposite, suggesting that we consider GSK LLC's nerve center in assessing GSK Holdings' citizenship because GSK Holdings has exerted no managerial control over GSK LLC, which is just the opposite of what is typically required to consider a parent's and subsidiary's citizenships jointly.[18]

---

[18] Plaintiffs attempt to support their approach by citing our decision in *Mennen Co. v. Atlantic Mutual Insurance Co.*, 147 F.3d 287 (3d Cir. 1998). In that case, which was decided before *Hertz*, we held that a corporation's principal place of business was the location in which its "day-to-day activities" were carried out. *Mennen*, 147 F.3d at 293. That location happened to also be the center of operations of a different company, which, pursuant to a management services contract, was conducting "the practical work" of the company whose citizenship was at issue. *Id.* Based on that precedent, Plaintiffs argue that "a court should consider services performed by one company on another company's behalf to determine the latter's principal place of business." (Reply Br. at 1-2.) But, in addition to being of questionable utility because it applied what is now an outdated test for determining a corporation's principle place of business,

30

Plaintiffs imply that that counterintuitive approach is required by *Hertz*. They note that *Hertz* instructs courts to identify a company's "actual center of direction, control, and coordination," 130 S. Ct. at 1192, and, because GSK Holdings exercises no control over GSK LLC's operations, they suggest that treating GSK Holdings' headquarters location as determinative of GSK LLC's citizenship would, in the words of *Maldonado*, "exalt form over substance." *Maldonado*, 841 F. Supp. 2d at 897. In support of that "form over substance" argument, Plaintiffs note the seamless change in corporate form from SmithKline Beecham, which was indisputably a Pennsylvania citizen, to GSK LLC, which Defendants now claim is a Delaware citizen. No people, offices, or operations moved from one state to the other during that transition, and so a change in citizenship seems to Plaintiffs to be in conflict with *Hertz*'s concentration on a company's "actual center of direction, control, and coordination." 130 S. Ct. at 1192.

The argument is not without logical appeal, but it suffers from two significant problems. First, it is GSK Holdings' nerve center – not GSK LLC's – that is at issue here. As described above, *Hertz*'s "nerve center" test is a means of identifying a corporation's principal place of

*Mennen* is readily distinguishable from this case. Here, GSK LLC did not enter into a contract to perform GSK Holdings' corporate activities; rather, it manages its own affairs as it is required to do by its LLC agreement. Plaintiffs provide no explanation for how a contractual agreement to perform services on a company's behalf is in any way analogous to the establishment of the management structure of an LLC, and their citation to *Mennen* is unpersuasive.

31

business.  A limited liability company's citizenship is not defined by its principal place of business, and thus the location of its nerve center is not at issue for purposes for establishing diversity jurisdiction.  *Hertz* therefore does not require that we identify the actual center of direction and control for GSK LLC – it requires only that we determine GSK Holdings' center of control.

More fundamentally, as troubling as those like Plaintiffs may find it, form matters for purposes of establishing jurisdiction, and the distinction between a corporation and an unincorporated entity has tremendous jurisdictional significance.  The Supreme Court has emphasized that, although a corporation has citizenship, unincorporated entities do not, regardless of their substantive similarities to corporations.  *Carden*, 494 U.S. at 195.  Plaintiffs may denounce that rule as elevating form over substance, but it is entirely consistent with the Supreme Court's approach to jurisdictional questions.  *See id.* at 196 (explaining that adherence to rigid rules "has been the character of our jurisprudence in this field"); *see also Hertz*, 130 S. Ct. at 1186 (insisting that jurisdictional rules "remain as simple as possible").  Therefore, the formal conversion of SmithKline Beecham to GSK LLC changes the jurisdictional calculus, despite the substantive continuity of business operations.  Whereas SmithKline Beecham – a corporation – was a citizen of the state in which it had its principal place of business, GSK LLC's citizenship is defined solely by the citizenship of its sole member, GSK Holdings.  Plaintiffs' delegation theory is an adroit attempt to shift the focus back onto GSK LLC's nerve center, but that is contrary to the approach required by the Supreme Court in *Carden* and by us in *Zambelli*.  There is nothing in *Hertz* to change that fact, as

32

*Hertz* deals solely with the definition of a corporation's "principal place of business."

We thus reject Plaintiffs' delegation theory, and instead proceed, as the District Court in this case did, to determine GSK Holdings' citizenship by considering its own activities, not those of GSK LLC.

## 2.     *GSK Holdings' Corporate Activities*

Plaintiffs argue that, even looking solely at the activities of GSK Holdings, it must be recognized as a citizen of Pennsylvania. As each court to examine GSK Holdings has agreed, its activities are very limited in scope. Because it is a holding company, not an operating company, GSK Holdings has no sales or production, only one part-time employee, and little infrastructure. Instead, its activities consist primarily of owning its interest in GSK LLC, holding intra-company accounts, issuing and receiving dividends, and paying taxes. As the District Court put it, "all holding companies do is 'hold,'" *Johnson*, 853 F. Supp. 2d at 493, and GSK Holdings is typical in that regard.

Hinging its decision largely on that fact, the District Court concluded that GSK Holdings' principal place of business is in Wilmington, Delaware. *Id.* at 493. Although it acknowledged that the company's "Wilmington 'footprint' is certainly modest," the Court "measure[d] that footprint … against the modest scope of Holdings'[] activities." *Id.* at 492. Finding that GSK Holdings' three-person board controls all of its limited, ownership-related activities, and that it does so "through resolutions that are considered and passed in Wilmington," *id.*, the Court concluded that its actual center of

33

direction, control, and coordination is in Delaware. *Id.* at 492-96; *see also Hertz*, 130 S. Ct. at 1192 (holding that a corporation's principal place of business is "the place where a corporation's officers direct, control, and coordinate the corporation's activities"). Accordingly, the Court held that GSK Holdings is not a Pennsylvania citizen. *Johnson*, 853 F. Supp. 2d at 493; s*ee also id.* at 495 ("Holdings'[] nerve center is where its ownership decisions are made: Wilmington.").

Plaintiffs argue that that conclusion contradicts *Hertz*, which specifically states that an office used solely for board meetings "attended by directors … who have traveled there for the occasion" should not be considered a company's actual center of direction and control. 130 S. Ct. at 1192; *see also id.* at 1195 (warning that an "alleged 'nerve center' [that] is nothing more than a mail drop box, a bare office with a computer, or the location of an annual executive retreat" might be an attempt at jurisdictional manipulation). GSK Holdings' ten-by-ten foot office in Wilmington closely fits that description, and Plaintiffs contend that the evidence demonstrates that no substantive decision-making could have occurred there. As *Brewer* put it, "the undisputed fact that the quarterly board meetings of [GSK] Holdings last no more than 15 or 20 minutes belies any argument that any operational or strategic decisions affecting the business activities are made during [those] brief meetings." 774 F. Supp. 2d. at 731. Plaintiffs also dismiss the role of GSK Holdings' Wilmington-based director, Donald McLamb, noting that he "performs only administrative functions" (Appellants' Opening Br. at 33), spends only about four hours per year conducting GSK Holdings' business, and serves as a director for numerous other companies. Citing all of those facts, Plaintiffs argue that no real decisions could have been

made during the board meetings and that the board's decisions must have been made elsewhere and simply ratified in Wilmington. Therefore, Plaintiffs say, Wilmington cannot be GSK Holdings' principal place of business under *Hertz*, as it is not GSK Holdings' actual center of direction and control.

Again Plaintiffs' reasoning has force but there are flaws that substantially weaken it. First, as the District Court rightly noted, the kind of board meetings denigrated in *Hertz* were being considered in the context of a case involving "a sprawling operating company," with "extensive activities carried out by 11,230 employees at facilities in 44 states." *Johnson*, 853 F. Supp. 2d at 493. For a holding company such as GSK Holdings, relatively short, quarterly board meetings may well be all that is required to direct and control the company's limited work. As former director Julian Heslop explained, the board generally conducts three tasks at each meeting: (1) it approves or corrects the minutes from the previous meeting, (2) it reviews the company's financial statements with George Brown, a London-based accountant who provides financial services to GSK Holdings, and (3) it addresses "any other business required to come before the meeting," such as authorizing agents to sign documents, making changes to the officers, paying a dividend, or, occasionally, restructuring the company's holdings. (App. at 709.) Generally, such business is straightforward and takes little time, yet it constitutes GSK Holdings' primary activity: managing its assets. The location of board meetings is therefore a more significant jurisdictional fact here than it was in *Hertz*, and the meetings' brevity does not necessarily reflect an absence of substantive decision-making.[19]

---

[19] The significance of that fact is further demonstrated

Second, the District Court's factual finding that GSK Holdings' board controls its investment activities through consensus-based resolutions at its meetings in Wilmington is not clearly erroneous. *See McCann*, 458 F.3d at 286

---

by the numerous post-*Hertz* cases that have determined the principal place of business of a holding company by looking to the location in which its officers or directors meet to make high-level management decisions. *See Lewis v. Lycoming*, No. 11-6475, 2012 WL 2422451, at *5 (E.D. Pa. June 27, 2012) (concluding that a holding company's nerve center is the place where its officers made major business decisions, not the location of its "public persona"); *Freedom Envtl. Servs., Inc. v. Borish*, No. 12-665, 2012 WL 2505723, at *1 (M.D. Fla. June 20, 2012) (considering the location of a holding company's board meetings in assessing its citizenship); *Sebastian Holdings, Inc. v. Kugler*, No. 08-1131, 2012 WL 1190837, at *3 (D. Conn. Mar. 30, 2012) (determining a holding company's citizenship based on the location in which its owner and director made management decisions); *Balachander v. AET Inc.*, No. 10-4805, 2011 WL 4500048, at *1 (S.D. Tex. Sept. 27, 2011) (relying on the location in which the company's chief officers make management decisions); *Ortiz v. Chesapeake Operating, Inc.*, No. 11-0055, 2011 WL 3584832, at *2 (W.D. La. Aug 12, 2011) (looking to where the holding company's directors make overall policy decisions, not to where its subsidiaries manage their day-to-day activities); *cf. Astra Oil Trading N.V. v. Petrobras Am. Inc.*, No. 09-1274, 2010 WL 3069793, at *3 (S.D. Tex. Aug. 4, 2010) (declining to use the location of the board of directors, but only because the company's sole officer had "significant independent authority as CEO … to direct, control, and coordinate [the company's] activities").

(applying clear error review to factual findings regarding citizenship and domicile). Each of GSK Holdings' three directors testified that only the board can authorize GSK Holdings to take a new action relating to its investments, and that the board does so by adopting resolutions at quarterly or special board meetings. None of GSK Holdings' individual directors or officers can take "new, unauthorized actions" on GSK Holdings' behalf, nor can GlaxoSmithKline plc, its ultimate parent in London, do so. (App. at 707-08.) The directors further explained that although individuals in Philadelphia and London provide various services to the board and sometimes sign documents, receive money, or pay taxes for GSK Holdings, the scope of their actions is "constrained by what the Board of Directors authorizes." (App. at 714.) Those individuals cannot make fundamental decisions – that power lies solely with the board.

The evidence also supports the District Court's finding that the board actually makes its decisions during its meetings, rather than simply ratifying decisions made elsewhere, as Plaintiffs claim. Although it is uncontested that "strategic direction and guidance … emanate[] from London" (App. at 710), as they likely do for all of the companies in the GSK group, GSK Holdings' directors insist that the board's decisions are not preordained. On the contrary, director Heslop explained that "[w]e sit down as a Board at our meetings … and go through the papers and make the decisions required of those meetings." (App. at 709.) Each director, including Wilmington-based director Donald McLamb, testified that he exercises his independent judgment in making those decisions and is not controlled by the other directors, officers, or corporate entities. In fact, McLamb explained that, as a Certified Public Accountant ("CPA") with

37

significant experience working under Delaware corporate law, he occupies an important role on the board, providing "assurance that [the] company will operate within the laws and proper corporate governance of Delaware," "looking out for the best interest of the shareholders" as an independent director, and ensuring that the board's decisions "are reasonable in nature and make good business sense." (App. at 785.) Such evidence, credited by the District Court, is enough to support the finding that the board engages in substantive decision-making during its meetings in Wilmington. *See Anderson*, 470 U.S. at 573-74 (holding that a court of appeals may not reverse a district court's factual finding if that court's "account of the evidence is plausible in light of the record viewed in its entirety").[20]

---

[20] Our concurring colleague disagrees, and says that "[t]he record does not support" the District Court's finding. (Concurring Op. at 6.) Rather, in his view, there is "no doubt" that any direction, control, or coordination exercised by GSK Holdings' board must have "been in line with the wishes of Heslop." (*Id.*) While our colleague is free to harbor his doubts, we are bound to a standard of review that does not permit us "to conduct a *de novo* review of the evidence." *Newark Branch, N.A.A.C.P. v. City of Bayonne*, 134 F.3d 113, 120 (3d Cir. 1998) (internal quotation marks omitted). Under Rule 52 of the Federal Rules of Civil Procedure, "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). The District Court considered the evidence, including statements by the board members, all of whom said they exercised independent judgment at board meetings and that the resolutions they adopted were not preordained. The District Court thus had a reasonable basis

38

Finally, despite Plaintiffs' insistence to the contrary, *Hertz* actually reinforces the District Court's conclusion that, in light of those factual findings, GSK Holdings' nerve center is in Wilmington. Even while cautioning courts to identify a corporation's actual center of direction and control, *Hertz* "place[d] primary weight upon the need for judicial administration of a jurisdictional statute to remain as simple as possible." 130 S. Ct. at 1186. The Supreme Court recognized that adopting the "nerve center" test would not resolve every ambiguity, and that "there will be hard cases." *Id.* at 1194. In fact, the Court specifically observed that, "in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet." *Id.* Rather than requiring courts facing such situations to weigh those different functions, *Hertz* reminded us that the "nerve center" test "points courts in a single direction, towards the center of overall direction, control, and coordination." *Id.*

---

on which to draw a factual conclusion about who was making decisions for GSK Holdings and where they were doing it. We are not at liberty to substitute our own reading of the facts when, as here, there is evidence directly supporting the District Court's finding. *See McCann*, 458 F.3d at 268 ("[O]ur sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i.e., whether we are left with a definite and firm conviction that a mistake has been committed." (internal quotation marks omitted)).

Here, it is clear that people in both Philadelphia and London contribute to GSK Holdings' operations. From London, George Brown prepares the financial documents reviewed during board meetings, Helen Jones oversees complex tax matters, Sarah-Jane Chilver-Stainer facilitates certain investments, and Julian Heslop's staff provide overall strategic guidance. From Philadelphia, Jan Lyons prepares GSK Holdings' tax return and provides tax advice, Audrey Klijian facilitates other investments and payments, and Michael Corrigan prepares for board meetings and carries out actions on GSK Holdings' behalf. Faced with this situation, we "do not have to try to weigh" those various corporate functions to determine GSK Holdings' principal place of business, but rather should look "towards the center of overall direction, control, and coordination." *Id.* All of the functions described above are intended to inform or facilitate the decisions of GSK Holdings' board of directors, which has the sole authority to adopt binding resolutions affecting the corporation's investments. Thus, the "single direction" in which the nerve center test points is toward the location of those decisions. As the District Court ably concluded from the evidence, that location is in Wilmington, Delaware.[21]

---

[21] In so concluding, we are not, as our concurring colleague implies, carving out a holding-company exception to *Hertz*. Rather, we are faithfully applying *Hertz*'s instruction to identify "the actual center of direction, control, and coordination" of a corporation. 130 S. Ct. at 1192. To do so, we first have to acknowledge the nature of the corporation's activities, as it is difficult to locate a corporation's brain without first identifying its body. In this case, GSK Holdings' sole function is to hold assets. Therefore, the question under *Hertz* is where *that activity* is

40

controlled and directed. When, as here, the evidence suggests that the board of directors actually controlled that activity, we do not think that *Hertz* requires us to ignore that fact and look instead to the location of certain corporate officers. Moreover, even if we were to look to GSK Holdings' officers (three of whom are also the members of the board of directors), the conclusion regarding the company's nerve center is not as clear as our colleague suggests. GSK Holdings has two officers in London, two in Philadelphia, and two in Wilmington, and each performs different functions. If we were to weigh those functions, we might agree that some of the most important work is performed in London, but that involves the type of balancing that *Hertz* eschews, and, in any event, it is not necessary when the facts, as found by the District Court, suggest that this particular corporation did not vest the relevant decision-making in its officers.

Our conclusion on this record does not mean that the location of board meetings will always determine a holding company's citizenship. If a holding company's officers, not its directors, actually control the company's core activities, or if the company's board makes decisions in one location and simply ratifies them in another, the holding company is unlikely to be a citizen of a state simply because that is where it holds its board meetings. Here, however, the record supports the conclusion that, although an array of support services were provided from different locations, the board controlled the company's core activities through decision-making at board meetings located in Delaware. In such an instance, *Hertz* encourages rather than discourages our looking to the location of the board meetings as the center of direction and control.

### 3. *Jurisdictional Manipulation*

Having concluded that GSK Holdings' nerve center is in Delaware, we now turn briefly to Plaintiffs' contention that that outcome is impermissible under *Hertz* because it would condone jurisdictional manipulation. *Hertz* cautioned that, "if the record reveals attempts at [jurisdictional] manipulation …[,] the courts should instead take as the 'nerve center' the place of actual direction, control, and coordination, in the absence of such manipulation." *Id.* at 1195. Plaintiffs argue that there is evidence of jurisdictional manipulation here and that we should not encourage that manipulation by concluding that GSK Holdings is a Delaware citizen. Specifically, they note that GSK Holdings altered its bylaws and sought to amend government documents associating it with a Philadelphia address. They allege that GSK Holdings made those post-discovery alterations to "bolster [its] contention … that [its] principal place of business is in Wilmington" (Appellants' Opening Br. at 46 (quoting *Brewer*, 774 F. Supp. 2d at 731)), and thus facilitate its removal of "hundreds of personal injury cases" that previously were in Pennsylvania state court (*id.* at 45). *Brewer* agreed, commenting that the post-discovery alteration "smacks of jurisdictional manipulation."[22] 774 F. Supp. 2d at 730.

---

[22] *Brewer* was careful to explain that it did not consider the transition from SmithKline Beecham to GSK LLC to itself be an attempt at jurisdictional manipulation, noting that "[GSK] LLC was formed to accomplish a legitimate business purpose and not to manipulate jurisdiction for litigation purposes." 774 F. Supp. 2d at 730. Plaintiffs conceded that point at oral argument, but they suggest that GSK Holdings

42

The record, however, squarely contradicts that contention. Although Defendants concede that, until recently, GSK Holdings' bylaws indicated that its headquarters and board meetings were in Philadelphia, as did a number of summaries of government contracts produced by government agencies, Defendants also presented uncontested evidence that those documents were inaccurate, and thus they could not have affected GSK Holdings' principal place of business. *See Hertz*, 130 S. Ct. at 115 (rejecting the notion that "the mere filing of a form … listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center'"); *Mennen Co. v. Atlantic Mut. Ins. Co.*, 147 F.3d 287, 293-94 (3d Cir. 1998) (rejecting representations of a company's principal place of business that "run contrary to the empirical facts with which the jurisdictional inquiry is concerned"). Adjusting those documents to reflect the reality of GSK Holdings' operations therefore did not affect jurisdiction, much less "manipulate" it improperly. Furthermore, although Plaintiffs express concern that GSK Holdings could easily manipulate jurisdiction by changing the location of its board meetings, they do not allege that that actually occurred here. Had GSK Holdings moved its board meetings in anticipation of litigation, the analysis of this issue could very well be different, but GSK Holdings' board has been meeting in Wilmington since 2001. There is simply no evidence of jurisdictional manipulation, and the District Court properly concluded that GSK Holdings'

---

may have located its meetings in Delaware to gain a jurisdictional benefit. They presented no evidence of such an intent, however, and that suggestion is belied by the fact that GSK Holdings began holding its board meetings in Delaware long before GSK LLC was formed.

principal place of business has consistently been in Delaware. The conclusion thus remains that, as GSK Holdings is GSK LLC's sole member, neither of the GSK Defendants is a Pennsylvania citizen.[23]

B.    *Citizenship of the Remaining Defendants*

Plaintiffs' fall-back argument is that SmithKline Beecham and Avantor Performance Materials are Pennsylvania citizens, which, if true, would defeat diversity

---

[23] Our concurring colleague worries about manipulation in future cases, expressing concern that our approach "will encourage parties to shift the location or formal authority of their corporate boards in order to create citizenship where those board meetings are held." (Concurring Op. at 8.)  We repeat, however, that evidence of manipulation – which is entirely lacking here – may well alter the calculus.  If there is such evidence, *Hertz* authorizes courts to disregard the attempts at manipulation, so the expressed concern is inordinate.  Of much greater concern would be a rule in keeping with our colleague's focus on the location of strategic decision-making, as it would risk disregarding the distinctions among the various corporate entities that often comprise large business enterprises.  Julian Heslop's team in London likely made strategic decisions that guided the activities of all of the corporations in the GSK group.  Under our colleague's approach, London could therefore be considered the "brain" of each and every GSK-related corporation, thus defining all of their citizenships.  Such an outcome would disregard our rule that parent and subsidiary corporations retain separate corporate identities. *See Quaker State*, 461 F.2d at 1142.

jurisdiction even though the GSK Defendants are citizens of Delaware. *See* 28 U.S.C. § 1332(a)(1) (requiring complete diversity). They contend that, although SmithKline Beecham converted to GSK LLC and dissolved as a Pennsylvania entity, Pennsylvania law preserves its citizenship for diversity jurisdiction purposes. As for Avantor, Plaintiffs concede that the corporation officially moved its operations from New Jersey to Pennsylvania five days after Defendants removed this action, but they suggest that Avantor's leadership may have already been operating from Pennsylvania at the time of removal. The District Court disagreed on both counts, finding that Avantor's headquarters moved at the same time as the rest of its operations, *Johnson*, 853 F. Supp. 2d at 496, and concluding that SmithKline Beecham's preserved citizenship is irrelevant because it is a nominal party that lacks a "real interest in the litigation," *id.* (internal quotation marks omitted).[24] We see no reason to disturb those rulings.

### 1. *SmithKline Beecham*

"[T]he 'citizens' upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the

---

[24] The District Court did not specifically address SmithKline Beecham's citizenship in its discussion of diversity jurisdiction, but Plaintiffs raised SmithKline's citizenship as a basis for remand, and the Court analyzed whether the company retained an interest in the litigation before denying Plaintiffs' request. *Johnson*, 853 F. Supp. 2d at 489, 496-97. Therefore, we understand that it declined to treat SmithKline as a Pennsylvania citizen due to its conclusion that the company was not a "real party in interest" to the controversy. *Id.* at 497.

45

controversy." *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 460 (1980). "Thus, a federal court must disregard nominal or formal parties," *id.* at 461, and can base its jurisdiction only upon the citizenship of parties with "a real interest in the litigation," *Bumberger v. Ins. Co. of N. Am.*, 952 F.2d 764, 767 (3d Cir. 1991).

Plaintiffs are correct that, generally speaking, Pennsylvania law preserves for a limited time a dissolved corporation's interest in litigation against it. The Pennsylvania code provides that, "[e]very business corporation that is dissolved … shall, nevertheless, continue to exist for the purpose of … prosecuting and defending actions or proceedings by or against it … ." 15 Pa. Cons. Stat. Ann. § 1978. It also ensures that the dissolution of a corporation does "not eliminate nor impair any remedy available to or against" it for a period of two years. *Id.* § 1979. We have held that when such a state statute renders a dissolved corporation "sufficiently alive to sue," the corporation also retains its citizenship for purposes of diversity jurisdiction. *Stentor Elec. Mfg. Co. v. Klaxon Co.*, 115 F.2d 268, 271 (3d Cir. 1940), *rev'd on other grounds*, 313 U.S. 487 (1941); *see also Ripalda v. Am. Operations Corp.*, 977 F.2d 1464, 1468 (D.C. Cir. 1992) ("[A] state statute extending the life of a dissolved corporation for the purpose of being sued also preserves the corporation as a citizen of the state of incorporation for the purpose of determining diversity of citizenship."). Accordingly, SmithKline Beecham's dissolution as a Pennsylvania corporation did not, standing alone, destroy its Pennsylvania citizenship or the import of that citizenship.[25]

---

[25] SmithKline dissolved on October 27, 2009, not quite

46

But SmithKline Beecham did not simply dissolve – it "domesticated itself under the laws of another jurisdiction," 15 Pa. Cons. Stat. Ann. § 1980, becoming a Delaware corporation and then converting to a Delaware limited liability company. *See* Del. Code Ann. tit. 8, § 265 (regarding conversion of a foreign entity into a Delaware corporation); *id.* tit. 6, § 18-214 (regarding conversion of a Delaware corporation into a Delaware LLC). That company – GSK LLC – has stepped into SmithKline Beecham's shoes, and, under Delaware law, all of SmithKline Beecham's "debts, liabilities and duties" now lie with GSK LLC. *Id.* tit. 6, § 18-214(f); *id.* tit. 8, § 265(f).[26] SmithKline Beecham thus

---

two years before Plaintiffs filed their complaint. *See* 15 Pa. Cons. Stat. Ann. § 1979 (preserving remedies against a dissolved company for two years).

[26] Those two provisions govern, respectively, the transition from a foreign corporation to a Delaware corporation, and from a Delaware corporation to a Delaware LLC. Title 8, § 265(f) provides that:

> When an other entity has been converted to a corporation of this State pursuant to this section, the corporation of this State shall, for all purposes of the laws of the State of Delaware, be deemed to be the same entity as the converting other entity. … [A]ll rights of creditors and all liens upon any property of such other entity shall be preserved unimpaired, and all debts, liabilities and duties of the other entity that has converted shall remain attached to the corporation of this State to which such other entity has converted, and may be enforced

has no actual interest in the outcome of the litigation, making it a "nominal party." *See Bumberger*, 952 F.2d at 767 (explaining that a "nominal party" is one that lacks "a real interest in the litigation"); *see also Strotek Corp. v. Air Transp. Ass'n of Am.*, 300 F.3d 1129, 1133 (9th Cir. 2002) (holding that a dissolved entity whose liabilities had been transferred to a different entity is not a real party in interest). Therefore, although SmithKline Beecham may technically still be a Pennsylvania citizen, we must disregard its citizenship for purposes of establishing diversity jurisdiction.[27]

> against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a corporation of this State.

Del. Code Ann. tit. 8, § 265(f). The language of Title 6, § 18-214(f) is very similar, providing, *inter alia*, that:

> [A]ll debts, liabilities and duties of the other entity that has converted shall remain attached to the domestic limited liability company to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company.

Del. Code Ann. tit. 6, § 18-214(f).

[27] For the same reason, SmithKline's apparent failure to consent to removal also does not provide a basis for remand. Although removal generally requires "unanimity among the defendants," that requirement does not extend to nominal parties. *Balazik v. Cnty. of Dauphin*, 44 F.3d 209,

## 2. *Avantor Performance Materials*

Avantor's citizenship also does not provide a basis for remand. Plaintiffs argue that Defendants, who bear the burden of proof, have "not presented any evidence that [Avantor's] officers directed, controlled, and coordinated its activities in New Jersey, rather than Pennsylvania, as of the date of removal." (Appellants' Opening Br. at 48.) Although Plaintiffs concede that the corporation officially moved its operations from New Jersey to Pennsylvania after Defendants removed this action, they suggest that Avantor's leadership may have begun operating from Pennsylvania before removal. The District Court saw things differently, finding that Avantor's headquarters moved from New Jersey to Pennsylvania at the same time as its rank-and-file employees – "five days *after* Defendants removed the case." *Johnson*, 853 F. Supp. 2d at 495. Based on that finding, the Court concluded that, "at all relevant times, Avantor was a citizen of New Jersey, not Pennsylvania." *Id.*

The date when Avantor's officers began controlling the company from Pennsylvania is purely a question of fact, and we therefore review the District Court's determination for clear error. *McCann*, 458 F.3d at 286. The Court based its finding on two affidavits from Avantor's general counsel, an internal company memorandum, and a newspaper report, each of which indicates that the entire company moved into its new

213 (3d Cir. 1995); *see also* 28 U.S.C. § 1446(b)(2)(A) (requiring that "all defendants who have been properly joined and served must join in or consent to the removal of the action").

Pennsylvania headquarters on September 19, 2011, after the case was removed. In response, Plaintiffs point to evidence that a number of corporate documents listed Avantor's Pennsylvania address prior to removal, and the fact that its CEO gave an interview from the new headquarters two days before the move (which, notably, is still after the date of removal). As the District Court explained, however, none of that evidence contradicts Avantor's account of the actual move, *Johnson*, 853 F. Supp. 2d at 495, and we cannot say that the Court's finding was clearly erroneous. Given its view of the facts, the District Court was correct to conclude that Avantor's nerve center was in New Jersey at all times relevant to this litigation, as its New Jersey headquarters was its actual center of direction and control at the time the complaint was filed and at the time of removal.

## IV. Conclusion

The District Court rightly held that GSK LLC and GSK Holdings are both citizens of Delaware, that SmithKline Beecham is a nominal party, and that Avantor was a citizen of New Jersey at the time this case was removed. As none of those Defendants was, at the time of removal, a citizen of a state where Plaintiffs are citizens, the parties satisfy the diversity of citizenship requirement of 28 U.S.C. § 1332. The District Court thus had original jurisdiction over the matter, making removal proper, 28 U.S.C. § 1441(a), and we must affirm the order denying Plaintiffs' motion for remand.

**AMBRO**, <u>Circuit Judge</u>, concurring in part and concurring in the judgment

I agree with my colleagues that the District Court properly denied Plaintiffs' motion to remand this case to state court. Defendants have met their burden of demonstrating that complete diversity exists between the opposing parties. Plaintiffs are citizens of Louisiana and Pennsylvania. Their arguments that Defendants—including GlaxoSmithKline Holdings ("GSK Holdings" or "Holdings") and GlaxoSmithKline LLC ("GSK LLC")—are also citizens of Pennsylvania I find wanting for the reasons set out in Judge Jordan's comprehensive and well-crafted opinion. As that opinion notes, the citizenship of GSK LLC depends on the citizenship of its sole member,[1] GSK Holdings, which is

---

[1] It is undisputed that GSK LLC is headquartered in Pennsylvania, where it operates its pharmaceutical business, and would not be diverse from Plaintiffs if it were deemed a citizen of its principal place of business. Thus our case is made more complicated by the doctrinal rule that unincorporated entities are treated like partnerships, instead of corporations, for diversity purposes. *Carden v. Akroma Assocs.*, 494 U.S. 185 (1990); *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412 (3d Cir. 2010). This test has been widely criticized. *See, e.g.*, Christine M. Kailus, Note, *Diversity Jurisdiction and Unincorporated Businesses: Collapsing the Doctrinal Wall*, 2007 U. Ill. L. Rev. 1543; Debra R. Cohen, *Limited Liability Company Citizenship: Reconsidering an Illogical and Inconsistent Choice*, 90 Marq. L. Rev. 269 (2006); Robert J. Tribeck, *Cracking the Doctrinal Wall of Chapman v. Barney: A New Diversity Test for Limited Partnerships and Limited Liability Companies*, 5

1

deemed for purposes of diversity jurisdiction a citizen "of the State or foreign state where it has its principal place of business." 28 U.S.C. § 1332(c)(1).

I write separately because I cannot agree with the conclusion in Part III.A.2 of the majority opinion that GSK Holdings' principal place of business is Wilmington, Delaware, where its board of directors holds very brief quarterly meetings. The parties disputed whether Holdings' principal place of business was Delaware or Pennsylvania, and the record is limited by their adherence to this dichotomy. But I believe that the facts and law point to a third option, that GSK Holdings' principal place of business is the United Kingdom, where the company's strategic direction is determined. Although our difference of opinion does not affect the outcome of this case, I believe that my colleagues' conclusion is in tension with *Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181 (2010), and, unless *Hertz* is changed or clarified by the Supreme Court, sets an incorrect precedent that will affect corporate citizenship rulings in future cases.

I.

---

Widener J. Pub. L. 89 (1995). Although this is not the case to revisit our holding in *Zambelli* (the issue was not even briefed and, in any event, *Zambelli* follows the lead of the Supreme Court in *Carden*), further understanding in this area may make the issue more pressing, especially if LLCs continue to complicate jurisdictional determinations. Perhaps Congress is most likely to effect change, as it did under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(10) ("[f]or the purpose of this section . . . an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business").

2

In *Hertz,* the Supreme Court defined a corporation's principal place of business under 28 U.S.C. § 1332(c)(1) as "the place where a corporation's *officers* direct, control, and coordinate the corporation's activities," called its "nerve center." 130 S. Ct. at 1192 (emphasis added). That nerve center is "not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id.* While acknowledging this limitation, my colleagues conclude that the location of the board of directors' meetings takes on increased jurisdictional significance when the entity involved is a holding company such as GSK Holdings. Majority Op. at 34–35. Their analysis has the effect of treating holding corporations differently than operating corporations.

Without clarification from the Supreme Court, I am skeptical that a corporation's status as a holding company changes the *Hertz* analysis. True, holding companies are different from operating companies because they hold and invest assets rather than manufacture, service, or sell. But whether a corporation holds or operates tells us little about its "actual center of direction, control, and coordination," metaphorically called its "brain" or "nerve center." *Hertz*, 130 S. Ct. at 1192–93. The terms "hold" and "operate" refer to what a corporation does with the assets it owns, but not necessarily who controls its actions and how extensive those actions may be. As the Court of Appeals for the First Circuit acknowledged in *Taber Partners*, many holding companies are more than lifeless corporate structures. They may be quite active in investing or managing their assets. *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 63–64 n.9 (1st Cir. 1993) (explaining that the holding companies in that case "*operate* out of New York," which is the location of their office, employees, bank accounts, working capital accounts, corporate books and records, and board meetings). Because holding companies have their own corporate

3

operations (though not as extensive as a typical operating company), I don't see the need to distinguish holding companies from the operating company addressed in *Hertz*.

My colleagues cite no case where a court has relied solely on the location of the board of directors' meeting to determine a holding company's principal place of business, nor has my research revealed one. Indeed, in all of the cases I have found—including all of the cases cited by my colleagues, *see* Majority Op. at 35 n.19—district courts have determined the actual place of control of holding companies by considering the location, responsibility, and functions of corporate *officers*, just as *Hertz* requires. *See, e.g.*, *Lewis v. Lycoming*, No. 11-6475, 2012 WL 2422451, at *5–6 (E.D. Pa. June 27, 2012) (determining nerve center based on place of review of monthly financial reports and strategic plans, candidate interviews, and personnel decisions); *Sebastian Holdings, Inc. v. Kugler*, No. 08-1131, 2012 WL 1190837, at *3 (D. Conn. Mar. 30, 2012) (determining nerve center based on officer's travel schedule, office locations, and meetings with strategic advisors).

As district courts seem to have had no trouble applying the *Hertz* test to holding companies, I am unpersuaded by the majority's argument that board of directors' meetings should be considered for the sake of administrative simplicity. If simplicity is the goal of a rule, no doubt it is quite simple to rule that a holding company, which holds and invests assets entrusted to it, is a citizen where its directors decree formally what those investments will be. But for now the test is what the brain tells the body to do, and here I do not think that brain is in Delaware.

4

II.

In determining a corporation's brain or nerve center, *Hertz* has us look to where the corporation's officers make leadership decisions about the company. 130 S. Ct. at 1193. In our case, I believe that is the United Kingdom, where GSK Holdings' "strategic direction and guidance . . . emanates from."[2] App. at 710. Julian Heslop, GSK Holdings' then-highest ranking officer and stationed in the United Kingdom,[3] testified that his staff there produces the "strategy and strategic formulation" for the company and "anything that impinges upon Holdings . . . that relates to strategic formulation." *Id.* at 710, 715. Similarly, "investment decisions for GSK Holdings," a principal activity of a holding company, are made under the direction of its officer Sara-Jane Chilver-Stainer, who is also based in the U.K. *Id.* at 684.

In contrast, relatively little is done in Delaware at GSK Holdings' perfunctory quarterly board meetings, which last from 15 to 30 minutes. *Id.* at 686. Two of the directors, Heslop and Michael Corrigan, often participate by phone

---

[2] Like my colleagues, I am concerned solely with GSK Holdings' principal place of business and not the nerve center of its parent or subsidiary companies. We have no reason to disregard Holdings' separate corporate identity. *Quaker State Dying & Finishing Co. v. ITT Terryphone Corp.*, 461 F.2d 1140 (3d Cir. 1972).

[3] Heslop retired prior to this case's removal, but the parties proceeded on a record produced before his retirement, and there is no evidence that GSK Holdings' corporate structure or activities changed after his departure. *See* Majority Op. at 10 n.7.

from their offices outside of Delaware. *Id.* at 695, 823. When he did attend in person, Heslop spent only enough time in Wilmington to attend Holdings' short Board meeting. *Id.* at 969. Often only the third director, Donald McLamb, a Wilmington Trust Services employee who is a director for dozens of other companies and spends less than ten hours per year on GSK Holdings, is present in Delaware. *Id*. at 756–57; 761–62. Board meetings consist primarily of three tasks: (1) approving or correcting minutes from the previous meeting; (2) reviewing the company's financial statements; and (3) addressing other necessary business, such as authorizing agents to act on GSK Holdings' behalf, approving dividend payments, or occasionally restructuring the company's holdings. *Id.* at 709–10. Only the last task could be considered a form of direction, control, or coordination, and no doubt it has been in line with the wishes of Heslop (and now his successor), whose team in the U.K. determines the strategy for the company.

I do not agree with my colleagues that the record supports their conclusion that the Board actually serves as the "brain" of GSK Holdings. The District Court—whose "ruling as to jurisdiction turn[ed] largely on the differences between a 'holding company' and an 'operating company'"—found that "Holdings'[] three Directors require no more than four 15- to 30- minute Board meetings a year to manage Holdings'[] affairs" and "the Board . . . controls all Holdings'[] actions . . . in Wilmington." *Johnson v. SmithKline Beecham Corp.*, 853 F. Supp. 2d 487, 491–92 (E.D. Pa. 2012). My colleagues uphold this finding, explaining that "relatively short, quarterly board meetings may well be all that is required to direct and control the company's limited work." Majority Op. at 35. The record does not support that conclusion. The District Court relied on Heslop's testimony that the "Board makes those" decisions "that actually control the activities of GSK Holdings" as well as the testimony of all three directors that

6

Holdings cannot take "new, unauthorized" actions without Board approval. App. at 707–08, 786, 823. As Heslop rightly explains, this is "very much traditional corporate governance," *id.* at 708, and could, it seems to me, be said of every corporation. A board of directors usually has the authority to make decisions that govern the corporation, but that authority is not the same as actual control; if it were, the nerve center test would always point to the location of the board of directors' meetings, contrary to what *Hertz* requires.

Moreover, these general statements of authority do not square with the scope of the activities of GSK Holdings. It "holds financial assets and liabilities" that include GSK LLC (a multi-billion dollar company and the GlaxoSmithKline family group's primary pharmaceutical business in the United States). *Id.* at 593, 672. It has held "more than $10 billion of intra-[GSK] group debt," serves as the "lead American company" for U.S. tax purposes, and "has litigated over its rights and obligations." *Id.* at 593, 688–89. There is no evidence that any actual analysis presaging GSK Holdings' major actions on these issues—such as the conversion of SmithKline Beecham to GSK LLC or Holdings' tax, investing, and litigation strategies—occurred, or could occur, during short board meetings held in Delaware. *Id.* at 709–10. Instead, the evidence shows that the actual oversight and control of these strategic decisions occur in the United Kingdom, and only later are made formal by Board vote.

Thus I cannot agree with my colleagues that 15- to 30-minute meetings in Delaware—where two of the directors in effect drive by or attend by phone while the other director services myriad other holding companies in Delaware and tends to GSK Holdings for, at most, a few hours each year—establish that Holdings' nerve center is in the state where those meetings are held. This is especially so when Heslop

himself tells us that strategic decisions governing Holdings are made in the United Kingdom.

I worry that my colleagues' approach will encourage parties to shift the location or formal authority of their corporate boards in order to create citizenship where those board meetings are held. My colleagues rightly state that courts have a responsibility to look past efforts at jurisdictional manipulation, but I think we likewise have a responsibility to avoid incentivizing manipulation that would require that inquiry. A holding company should be treated like any other company under the *Hertz* test, looking for the "center of overall direction, control, and coordination" of the corporation, and "not simply an office where the corporation holds its board meetings." *Hertz*, 130 S. Ct. at 1192, 1194.

In light of this clear language, I believe the location of board of directors' meetings should only be deemed the nerve center of a corporation when evidence is absent that its actual guidance, supervision, and management—by its officers—occurs elsewhere. That absence is not the case here. Officers of GSK Holdings in the United Kingdom make the calls later formalized by its board of directors in Delaware. Under *Hertz*, its brain is thus located in the U.K.

\*   \*   \*   \*   \*

My colleagues have done a masterful job in addressing the parties' arguments that GSK Holdings' principal place of business is either in Pennsylvania or Delaware. But the United Kingdom is also in play, and here critically so. My colleagues' rationalization of sparse facts is, in effect, that holding companies are different than operating companies for the purpose of the nerve center test. For them, this holds true until the Supreme Court tells us otherwise; for me the nerve center test applies uniformly to all companies until the

Supreme Court tells us otherwise. For these reasons, I respectfully concur in the majority's judgment and in its opinion except for Part III.A.2.